[Civ. No. 30820.   Second Dist., Div. Five.   May 13, 1968.]

CONFERENCE OF REFEREES OF THE WORKMEN'S COMPENSATION APPEALS BOARD et al., Plaintiffs and Appellants, v. STATE PERSONNEL BOARD et al., Defendants and Respondents.

Ball, Hunt, Hart & Brown, Joseph A. Ball and Frederic G. Marks for Plaintiffs and Appellants.

Thomas C. Lynch, Attorney General, Robert Burton and John M. Huntington, Deputy Attorneys General, for Defendants and Respondents.

KAUS, P. J. — Plaintiffs, civil service employees of the State of California, sought declaratory relief and a writ of mandate directing the defendant State Personnel Board (''board'') to proceed to adjust plaintiffs' salaries in accordance with the plaintiffs' interpretation of section 123 of the Labor Code.

Section 123 of the Labor Code reads, in pertinent part: ''The salaries of the referees shall be fixed by the State Personnel Board for a class of positions which perform judicial functions.''

In their complaint, plaintiffs contended that the quoted language of section 123 requires the board to fix the salaries of Industrial Accident Commission (''I.A.C.'') referees[1] at a level equal to that of municipal or superior court judges.[2]

In their opening brief filed with this court plaintiffs contend that section 123 requires that the board, in setting plaintiffs' salaries, compare their duties only with those of other positions performing true (as opposed to ''quasi'') judicial functions. Plaintiffs assert this requires that they be paid a salary comparable to that paid municipal and superior court judges, I.A.C. commissioners and commissioners of the Public Utilities Commission.

The crucial issue for decision is whether the Legislature by its use of the words ''judicial functions'' in section 123 of the Labor Code meant to tie the salaries of I.A.C. referees to those of specific judicial officers exercising constitutionally defined and delegated judicial powers.

---

[1]By legislation enacted in 1965, the Industrial Accident Commission was replaced by the Workmen's Compensation Appeals Board. The parties hereto, however, use the term Industrial Accident Commission and the abbreviation I.A.C. We shall conform to the practice.

[2]During oral argument in the trial court, plaintiffs' counsel modified his position by stating that the class of positions performing judicial functions most similar to those performed by the referees is that of the I.A.C. commissioners.

Before the enactment of section 123,[3] the board, in setting I.A.C. referees' salaries, was governed by section 18850 of the Government Code which provides: ''The board shall establish and adjust salary ranges for each class of positions in the state civil service. The salary range shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities. In establishing or changing such ranges consideration shall be given to the prevailing rates for comparable service in other public employment and in private business. The board shall make no adjustments which require expenditure in excess of existing appropriations which may be used for salary increase purposes. The board may make a change in salary range retroactive to the date of application for such change.''

Section 123 was enacted in 1951. (Stats. 1951, ch. 1613, § 54, p. 3634.) Earlier in 1951, the Legislature enacted sections 115 and 5313 of the Labor Code (Stats. 1951, ch. 778, §§ 1, 7, pp. 2266-2267) which delegated to the I.A.C. referees the power to make final, binding decisions. Before this legislation the referees made recommendations to the commission, but final decisions were made by the I.A.C. commissioners acting in panels of three. The commissioners could adopt, modify or reject the recommendations of the referees.

Section 123 was part of a bill (AB 2882) which made numerous salary adjustments for a variety of state employees. The initial version of section 123 specified a minimum salary range at which the board might set referees' salaries ($676-$821 per month). This restriction was amended out before final passage of Assembly Bill 2882 and the present language of section 123 substituted for it. At the time the referees were on a salary range of $613 to $745 per month. After passage of Assembly Bill 2882 the board raised the referees to a salary of $710 to $862 per month—a 15 percent increase. The board's adjustment thus exceeded the minimum amount which had been under consideration by the Legislature.

Pay increases for referees, I.A.C. commissioners, highest and lowest paid municipal court judges, and superior court judges in Los Angeles County[4] compared as follows for the

[3]Throuhout this opinion, reference to ''section 123'' refers to that section of the Labor Code. Reference to ''section 18850'' refers to that section of the Government Code.

[4]Until 1964 the salaries of superior and municipal court judges were not uniform throughout the state.

period beginning with the enactment of section 123 and ending in September 1964, when the present suit was filed:

|  | Pay Sept. 1951 | Pay Sept. 1964 | Increase % |
|---|---|---|---|
| Referees | $ 745.00 | $1,419.00 | 90.14 |
| Commissioners | $ 916.00 | $1,708.00 | 86.4 |
| Municipal Court Judges (L. A. County) | $1,250.00 | $1,917.00 | 53.3 |
| Municipal Court Judges (Smallest Counties) | $ 600.00 | $1,917.00 | 219.5[5] |
| Superior Court Judges (L. A. County) | $1,400.00 | $2,083.00 | 48.7 |

At no time from the passage of section 123 until the filing of the present action did the board attempt to tie the salaries of referees to those of either commissioners or judges. Nor does it appear that the Legislature, in adjusting salaries of judges and commissioners, was governed by fluctuations in the salaries of referees. Repeatedly over this period the salary increases of referees varied in number, in time, in amounts and in percentage from increases given the other classifications.

That this situation reflected the will of the Legislature may be inferred from the legislative activities following passage of section 123. Beginning with the 1953 General Session of the Legislature and at each General Session thereafter through 1963—with the exception of the 1959 session—various items of legislation were introduced to modify or repeal section 123. Of these, two sought to establish a specified minimum dollar amount below which the board could not set referees' salaries. One bill provided that consideration be given to the ratio between referees' salaries and commissioners' salaries as of January 1957, at which time salaries for the two positions

[5]This tremendous increase is no indication of any inequity in the salary of referees. Rather it was a legislative recognition and remedy of the obvious gross inequity between the salaries of municipal court judges in smaller counties and the salaries of those in the larger counties. This is conclusively demonstrated by the massive increase from $667 per month to $1,125 per month given the lowest paid municipal court judges in 1955, at a time when municipal court judges in Los Angeles County received an increase of less than $150 per month, as well as by the ultimate enactment of uniform salaries for all municipal court judges in August 1964.

were equal. Two such bills provided that commissioners' salaries not be a limitation on referees' salaries.[6] One of these bills further provided that no comparison be made by the board between referees and other positions performing either administrative of quasi-judicial functions.

Six bills specifically attempted to tie referees' salaries to those of various judges.

None of these bills passed the Legislature, although all were assigned to committee, several were amended and at least one such bill was passed by the Assembly. The last referred to bill, after passage by the Assembly, and amendment by the Senate contained the following language with reference to referees' salaries: "In fixing such salaries direct comparison shall be made with salaries fixed for judges of the superior court and municipal courts located in cities of the first class, but in a salary range that shall not be less than the minimum salary of such judges or more than the maximum salary paid said judges."

In spite of these persistent efforts section 123 continued in its original form insofar as it affected referees' salaries. At the 1963 General Session two resolutions were introduced in the Legislature calling on the board to reevaluate referees' salaries. Assembly Concurrent Resolution 41 called for the board to reevaluate referees' salaries "giving cognizance to their essential judicial functions." Senate Concurrent Resolution 73 as originally introduced called on the board to review the salaries of legal examiners, hearing officers and referees in state service and to eliminate any differences in such salaries "not warranted by differences in duties and responsibilities." Senate Concurrent Resolution 73 was then amended by the Senate to provide that the board implement recommendations of legislative committees respecting the salary of any of the enumerated classes.[7]

Neither Assembly Concurrent Resolution 41 nor Senate Concurrent Resolution 73 passed the Legislature. Finally, Senate Concurrent Resolution 1 was introduced at the 1963

---

[6] In fact the board had apparently not treated the commissioners' salaries as a limitation since it set the referees' salaries at a level above those of the commissioners for a time in 1955 and again in 1957.

[7] The introduction to Assembly Concurrent Resolution 41, *supra*, stated that the Assembly Interim Committee on Judiciary had found that the duties and responsibilities of I.A.C. referees were similar to those of trial judges.

First Extraordinary Session and was passed by the Legislature. It provided that:

"WHEREAS, There are in the state government numerous classes of legal examiners, hearing officers, and referees, and at each general session, bills have been introduced to change the compensation of some of these classes; and

"WHEREAS, It has not been feasible for the Legislature to evaluate the merits of these bills on a piecemeal basis, and the Legislature has passed none of them; and

"WHEREAS, The Legislature has instituted, and continues to support, a policy of equal pay for comparable duties and responsibilities, and the bills referred to indicate that there may, in fact, be salary inequities; now, therefore, be it

"*Resolved by the Senate of the State of California,* The Assembly thereof concurring. That the State Personnel Board is requested to conduct a comprehensive review of the salaries of legal examiners, hearing officers, and referees in the state government, and, in making such review, to give due hearing to representatives of the affected agencies; and be it further

"*Resolved,* That to the extent that it is within its power to do so, the board shall eliminate any differences in salaries of such personnel not warranted by differences in duties and responsibilities; and be it further

"*Resolved,* That the board shall report to the Legislature at the 1964 Regular Session on the steps it has taken pursuant to this resolution and on the need, if any, for additional legislation relating to this subject. . . ."

In response to this directive from the Legislature, the board employed a Sacramento attorney, Frank K. Richardson, as a consultant. He prepared and submitted to the board on April 6, 1964, a comprehensive report entitled "A Comparative Study of Legal Examiners, Hearing Officers, and Referees in California State Service." The entire report was submitted in evidence by defendant in the trial court and forms a part of the record on appeal.

The report devoted 26½ pages to a detailed analysis of the duties, responsibilities, and qualifications of I.A.C. referees; 18 pages to those hearing officers with the Office of Administrative Procedure ("O.A.P."); 18 pages to those of legal examiners with the Public Utilities Commission ("P.U.C."); and 14 pages to those of referees with the Unemployment Insurance Appeals Board ("U.I.A.B.").

Mr. Richardson reached the following conclusions: There is no satisfactory basis for distinguishing between the duties

and responsibilities of the I.A.C. referees, the O.A.P. hearing officers and the legal examiners of the P.U.C. Attention was paid to the fact that of these three groups only I.A.C. referees perform true judicial functions, whereas the others perform only quasi-judicial duties. This, however, was regarded as a distinction without a difference. ''The more accurate evaluation, it is submitted, is that all of these officials are engaged in a judicial type function in that, first, they are ascertaining facts; secondly, they are applying to those facts, as found, statutory or case law as a result of which a decision is formed with a resultant award, or penalty, or other judgment. This judgment or decision in every instance is tentative in the sense that it can be reviewed by the Commission or Agency or Board, and then may be reviewed to a greater or lesser extent in the courts. The scope of administrative and judicial review is variable but the steps are constant.''

The proviso in section 123 with respect to ''judicial'' functions was considered in conjunction with the parallel principle found in section 18850 of equal pay for comparable duties and responsibilities. Richardson concluded that the theoretical finality of decisions of the I.A.C. referees was matched by the practical finality of decisions of O.A.P. hearing officers and P.U.C. legal examiners since 85 to 90 percent of the time the proposed decisions of the latter were adopted as the actual decisions of the agency involved.

Richardson further concluded that referees of the U.I.A.B. do not have duties and responsibilities equivalent to those of the other three positions he had considered.

Finally, Richardson found that although ''the duties and responsibilities of Referees, Industrial Accident Commission · Hearing Officers, Office of Administrative Procedure; and Legal Examiners, Public Utilities Commission, closely approach those of Municipal Judges, none of them can be fully equated with Judges, either of the Superior or Municipal Court.''

Amongst the reasons enumerated by Richardson in support of his conclusion that none of the officials under consideration was comparable to a judge of either the superior or municipal court were the following: ''First, the unlimited scope of the substantive and procedural law which, if not regularly at least frequently, is submitted for ruling by the judge and which is not met by any of the other officials in question. Secondly, the infinite variety of the issues in a law suit are

far broader than any of those presented to the Officials in question. Thirdly, there is no intermediate review of the judges' findings such as is present in the case of each of the officials in question. Fourthly, there is a power vested in every judge to overturn and substitute his own findings in a given case in the event the trier of fact has been a jury. Such a power is not possessed by any of the officials involved. Fifthly, there is a broad jurisdiction and authority in criminal matters vested in the judge which includes imposition of a fine, imprisonment and even death, which is not approached by any of the officials in question.''

Richardson equated the duties of I.A.C. referees, O.A.P. hearing officers, and P.U.C. legal examiners to those of superior court commissioners and federal referees in bankruptcy.

Following receipt of the Richardson report by the board, the board's staff submitted its own analysis of salary relationships of legal examiners, hearing officers and referees in state service. The heart of the staff report is the following conclusion: ''For many years, the staff has believed that the salaries for this group of classes should be related primarily to the general legal occupational series of classes in State service since the work of these organizations is legal and the incumbents in these positions are primarily lawyers. It is the staff's view that this relationship should continue to be the primary reference. . . .''[8]

It seems to us that the very fact that the board saw fit to commission Mr. Richardson to prepare an independent study would imply that the board either questioned its own staff's ability to undertake a sufficiently comprehensive review of the subject or disagreed with the staff's theory that the primary salary setting reference should be to legal classes—a theory which, as indicated above, the staff had held for many years.

Upon receipt of the Richardson Report, the board, at its April 10, 1964, meeting scheduled a hearing for June 4, 1964,

[8]The trial judges considered the language of the staff report quoted above and correctly concluded, during oral argument below, ''. . . the staff's interpretation is erroneous, whether or not I decide the writ should be issued or whether the declaratory relief should be granted.'' He indicated, however, during the oral argument that the mere fact that the staff report was submitted to the board did not necessarily mean that the board agreed with it or followed the staff's recommendations. The trial judge inquired of the Attorney General whether he thought the position of the staff ''a correct statement of the statutory mandate of the State Personnel Board.'' The Attorney General replied that he did not.

"to afford an opportunity for all interested groups to present their points of view to the Board concerning this matter. . . ." Written communications were submitted to the board on behalf of O.A.P. hearing officers, U.I.A.B. referees, P.U.C. legal examiners and I.A.C. referees. The communications on behalf of the plaintiffs included a letter from the chairman of the I.A.C., a letter from an attorney who had formerly served as a referee, a six-page memorandum regarding plaintiffs' salaries and a formal petition requesting an immediate upward adjustment in salary, both prepared by plaintiffs' then attorneys. Oral testimony on behalf of the plaintiffs was also presented at the June 4, 1964, hearing of the board.

Thereafter, on July 9, 1964, salary increases were adopted by the board for a number of civil service positions including some hearing officers. On the same date the board voted to dismiss from its calendar, and thereby denied, an agenda item relating to salary adjustments for plaintiffs.[9]

On July 13, 1964, Sherman Grancell, one of the individual plaintiffs herein and then President of the Conference of Referees of the Industrial Accident Commission, sent a letter to the board. This letter inquired what action, if any, had been taken on the referees' petition. The response by John F. Fisher, Executive Officer of the board, contained the following statement: "I do not believe that the Personnel Board has in mind taking any further action at this time with respect to the salaries of any of the Referee or legal classes. The internal relationships that now exist among the Referee and Hearing Officer classes fulfill to a substantial degree the recommendations made by Mr. Framk Richardson. In order to consider a further increase in the salary of Referee, Industrial Accident Commission, specifically, the Personnel Board would have to seriously examine the effect of the changed relationship this would bring about, both with other Hearing Officer classes as well as with legal classes generally."

On September 24, 1964, the instant action was brought.

Additional legislation to amend section 123 of the Labor Code was introduced at the 1965 General Session of the Legislature. Senate Bill 97 as originally introduced would have tied plaintiffs' salaries to those of judges. It was amended in the Senate to specify a minimum dollar amount. Senate Bill 1056 attempted to tie plaintiffs' salaries to those of I.A.C.

[9]Plaintiffs had last received a salary increase, to a top salary of $1,419 per month, in January 1964.

commissioners. Assembly Bills 1366 and 2206 would have tied plaintiffs' salaries to those of judges. None of these bills passed the Legislature.

The above facts were brought to the attention of the trial court in connection with plaintiffs' application for a peremptory writ of mandate and defendants' notice of motion for summary judgment which were heard together. After extensive argument, both oral and written, the trial court filed an opinion in which it denied the plaintiffs' application. The court then signed findings of fact and conclusions of law in which it delineated its interpretation of the board's duties with respect to the referees' salaries. We quote from the conclusions:

"1. The State Personnel Board, in dismissing or denying the petitioners' and plaintiffs' request for a salary increase, followed proper procedures and complied with its statutory mandate and duties.

"2. Section 123 of the Labor Code of California does not prohibit the State Personnel Board from considering or giving weight to judicial functions performed by State Referees or Hearing Officers other than Referees of the Industrial Accident Commission.

"3. Section 123 of the Labor Code of California does not prevent or preclude the State Personnel Board from exercising discretion granted by Section 18850 of the Government Code of California.

"4. The State Personnel Board had and has the right and duty to compare the salaries of Referees of the Industrial Accident Commission with comparable classes in the State Civil Service such as other Referees and Hearing Officers in the State Government.

"5. The State Personnel Board has and had the right and the duty to compare the salaries of Referees of the Industrial Accident Commission with salaries of Judges and Commissioners of the Industrial Accident Commissioner [*sic*] of the State of California.

"6. This Court prepared its Opinion and Order filed herein on June 21, 1965, setting forth its conclusions of law and its interpretation and declaration of the meaning of the applicable statutes. The conclusions of law and interpretations of the applicable statutes set forth therein are adopted as the conclusions of law and interpretation of this Court as declaratory relief as if fully set forth herein at this time.

"7. The petitioners and plaintiffs take nothing by this action. A peremptory writ of mandate is denied. The respondents and defendants are entitled to their costs of suit incurred herein."

Plaintiffs contend that the denial of their request for a salary increase in July 1964, was an abuse of discretion and that there are no other hearing officers performing judicial functions within the civil service which can be used as an appropriate salary fixing reference.[10]

We agree entirely with the trial court. ██ It goes without saying that, if at all possible, section 123 and section 18850 must be harmonized. "This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject." (*Hough* v. *McCarthy*, 54 Cal.2d 273, 279 [5 Cal.Rptr. 668, 353 P.2d 276].)

██ Section 18850 is, as it were, the board's charter for the fixing of civil service salaries. It establishes several guiding principles:

1. Like salaries shall be paid for comparable duties and responsibilities;

2. Consideration shall be given to prevailing rates for comparable service in other public employment and in private business;

3. No adjustments shall be made which require expenditures in excess of existing appropriations.[11]

Plaintiffs' argument boils down to this: they are the only hearing officers in the civil service who perform judicial functions. Therefore, the board must look to other public servants who perform such functions who are not in civil service, such as the judges of the municipal and superior courts and the

---

[10]Plaintiffs state in their opening brief in this court: "The essence of our quarrel with the Board is not that I.A.C. Referees do not receive a salary identical with that of I.A.C. Commissioners, or judges of the Superior and Municipal Courts. We object only (1) to the Board's refusal to consider the salaries of those positions as the appropriate salary-fixing reference; and (2) to the Board's insistence on using as a salary-fixing reference positions not performing true judicial functions, *i.e.*, hearing officers of the various administrative agencies."

[11]At the hearing below it was pointed out that there was a disputed question of fact between the parties with respect to the availability of funds. It was agreed that if the court's interpretation of the board's duies was unfavorable to the board the question whether any salary increase to the referees would require expenditures in excess of existing appropriations could be reopened. This, of course, proved to be unnecessary.

I.A.C. commissioners. All of these received substantial pay increases in the summer of 1964 and the board's refusal to give the referees any relief while raising the salaries of hearing officers of the O.A.P., referees of the U.I.A.B. and of its own hearing officers, constituted an abuse of discretion.

Undoubtedly the Legislature, in 1951, intended that some financial recognition be given to the fact that the referees were then given the power to make final decisions rather than recommendations. Unquestionably this legislative mandate was observed by the board when it granted the referees a substantial salary increase immediately after the passage of section 123. We do not mean to imply that the force of section 123 was spent with the first salary adjustment after its passage, but we do believe that plaintiffs exaggerate its effect.

Within the board's jurisdiction there are several classes of hearing officers. Plaintiffs have a perfectly plausible argument why they are more judicial than the members of the other classes. Their chief point is, as already noted, that the power to make final decisions[12] distinguishes them from the rest.

We do not think this distinction can carry as much water as plaintiffs would have it do. In the procedural context of a matter pending before a hearing officer or referee, it may be quite important whether the "judge" can make a final decision or merely a recommendation,[13] but within the overall salary setting picture, the board can quite legitimately balance other factors against this one unique power. The fact that referees make final decisions does not put them in a vacuum and deprive the board of the duty of comparing their responsibilities with those of other hearing officers and, indeed, all other classes of positions under its jurisdiction.

We note that there are two classes of hearing officers who work for the O.A.P. In July 1964, the class designated as

[12]The argument that plaintiffs are the only hearing officers within the civil service who make final decisions is mistaken. The referees of the Unemployment Insurance Appeals Board are given the power to "hear and render a decision in every matter in which a petition is filed with, or an appeal is taken to, a referee. . . ." (Unemp. Ins. Code, § 404.) The referees' decisions are final (Unemp. Ins. Code, § 1334) although they may be appealed to the appeals board which appears to have powers reasonably similar to those of the commissioners of the Industrial Accident Commission. (Unemp. Ins. Code, § 1336; cf. Lab. Code, § 5906.) It is true that the referees of the Unemployment Insurance Appeals Board need not be members of the State Bar of California. (Unemp. Ins. Code, § 405.)

[13]During the argument below counsel for plaintiffs argued: ". . . anyone can sit up and rule on evidence if someone else has the final say or determination."

Hearing Officer I was raised to a salary range with a top step of $1,351, considerably below the top step of $1,419 then being paid to plaintiffs. Hearing Officers II, on the other hand, were raised to a slary range identical with plaintiffs. Since Hearing Officers I were hearing cases just like Hearing Officers II, it may be assumed that the latter performed administrative functions in addition to hearing cases.

It should also be pointed out that the finality of plaintiffs' decisions is a very different thing than the finality of decisions of trial courts. While court decisions become final unless one of the parties initiates the appellate process, this is not true in the matters decided by plaintiffs. Section 5900 of the Labor Code permits the commission to grant reconsideration on its own motion —in other words the relationship between the commission and the referees is, in that respect, more like that of the Supreme Court of California and the Courts of Appeal. (Cal. Rules of Court, rule 28.) Further, when reconsideration is granted, the decision of the referees is not paid the same respect which appellate courts pay trial court decisions. The commission may ''with or without further proceedings and with or without notice affirm, rescind, alter, or amend'' the referee's decision. (Lab. Code, § 5906.) In other words, the party seeking reconsideration gets a trial de novo which may be heard and decided without additional evidence being produced. (*Argonaut Ins. Exchange* v. *Industrial Acc. Com.*, 49 Cal.2d 706, 711 [321 P.2d 460].) It is not until workmen's compensation cases reach the courts that the substantial evidence rule applies. (*Ibid.*, p. 713.) The law is more respectful to justices of the peace. Although their cases too, if appealed, result in a trial de novo (Code Civ. Proc., § 976) the appellate tribunal must, at least, hear the witnesses.

We do not mention these things to belittle the work done by the referees. We merely wish to demonstrate that there is no particular magic in the fact that, unless further action is taken, they make final decisions.

Plaintiffs place great reliance on *Walker* v. *County of Los Angeles*, 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247]. There the board of supervisors was required to make an annual survey of prevailing wages paid by private persons or corporations for employment similar to that being performed by the county employees. After such survey the board of supervisors had to set salaries and wages for such employees by ordinance each year before July 1. The wages had to be

"at least equal" to the prevailing private wages. In 1958 a survey was made but, after long discussion, the only salary ordinance which was adopted was one which continued the preceding year's wage schedule, although the salary survey had clearly indicated that raises were due. The trial court granted a writ of mandate and the Supreme Court affirmed. In so doing the court pointed out that the language of the applicable section of the county charter was mandatory and compelled the supervisors to adopt a salary ordinance providing for wages "at least equal" to the prevailing wages being paid in private employment. Obviously the board of supervisors had completely failed to comply with a very specific mandatory duty and the rule that the courts may interfere in these wage matters if the wage setting authority's " 'action is fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law' " (*Ibid.*, p. 639) came into play.

The case at bar is quite different. In July of 1964 the board had on its agenda questions concerning salary adjustments for about 375 classes of positions. In all but a handful of cases it acted favorably. Unfortunately for plaintiffs they as well as certain other classes[14] did not get a raise. This by no means proves, as they contend, that the board did not exercise its discretion within the broad mandate of section 18850.

The numerous attempts to change section 123 after 1951 have been noted. Plaintiffs would have the courts do precisely what time and again the Legislature has refused to do, that is to handcuff the board by a more specific directive than the present language of section 123 of the Labor Code. Under settled principles we cannot do so.

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 10, 1968. Traynor, C. J., did not participate therein.

---

[14]Certain legal examiners, hearing officers, Assistants Attorney General I and II, Deputy Attorney General IV and certain clerical and allied classes.